UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND
- - - - - - - - - - - - - - - - -x

In re:                              :

IDC CLAMBAKES, INC.                 :    BK No. 05-12267
            Debtor                          Chapter 11


- - - - - - - - - - - - - - - - -x


### <u>DECISION AND ORDER ON REMAND</u>

APPEARANCES:

> William P. Devereaux, Esq.
> Attorney for Debtor
> PANNONE LOPES & DEVEREAUX LLC.
> 317 Iron Horse Way, Suite 301
> Providence, Rhode Island 02908

> W. Mark Russo, Esq.
> Attorney for Debtor
> FERRUCCI RUSSO PC
> 55 Pine Street, 4th floor
> Providence, Rhode Island 02903

> William R. Grimm, Esq.
> Attorney for the Creditors
> HINCKLEY, ALLEN & SNYDER LLP
> 1500 Fleet Center
> Providence, Rhode Island 02903

> Charles D. Blackman, Esq.
> Attorney for Creditors
> 155 South Main Street, Suite 101
> Providence, Rhode Island 02903


**BEFORE ARTHUR N. VOTOLATO, United States Bankruptcy Judge**

BK No. 05-12267

This matter is before the Court on remand from the United States District Court, with instructions to: (1) "ensure that any disposition of the issue of whether [IDC Clambakes, Inc.] trespassed on Association property comport with due process requirements"; (2) "carefully adhere to the elements of trespass under Rhode Island law"; and if a trespass is found (3) "reconsider whether the Association's claim for trespass damages is precluded by either *Am. Condo. Ass'n, Inc. v. IDC, Inc.*, 844 A.2d 117 (RI 2004) ("*America I*") or *Am. Condo. Ass'n, Inc. v. IDC, Inc.*, 870 A.2d 434 (RI 2005) ("*America II*")." *Goat Island S. Condo. Ass'n, Inc. v. IDC Clambakes, Inc.*, 382 BR 178, 179 (D.R.I. 2008).

Following the remand, this Court held a nine day trial on the merits of the proofs of claim litigation, which included the testimony of 7 witnesses, 765 transcript pages, and 137 exhibits. Both parties submitted detailed post-trial memoranda, as well as reply and sur-reply briefs. This Court is satisfied that all due process requirements have been met.

## PROCEDURAL BACKGROUND

This particular litigation arises out of the Debtor Clambakes' objection to proofs of claim filed by America Condominium Association Inc., Capella South Condominium Association, Inc., Harbor Houses Condominium Association, Inc., and Goat Island South Condominium Association, Inc. (collectively, the "Associations")

1

[Claim Nos. 16,17,18 and 19], in the aggregate amount of $3,507,290, for damages arising out of Clambakes' alleged seven year trespass on a specific parcel of condominium property, the Reserved Area.    Thomas R. Roos ("Roos"), Clambakes' sole shareholder, joined in the Debtor's objection.

This dispute was first presented in this Court on Clambake's Motion for Summary Judgment on September 27, 2006.    While the matter was under advisement, both sides filed numerous additional memoranda, and on January 24, 2007, I issued my initial ruling(s) disallowing the Associations' claims for damages for trespass. That decision was appealed to the U.S. District Court, and on February 8, 2008, Judge William E. Smith issued his rulings and remand order as described above.

## FACTUAL BACKGROUND

The trespass claim discussed herein involves a number of disputes between the Associations, and Thomas Roos and several of his wholly owned enterprises, IDC, Inc.,[1] and IDC Properties, Inc. ("Properties") dating back to the early 1990's, which have been litigated in various actions and appeals in the Rhode Island state courts.    All of that litigation was finally concluded in April 2005.    *See Am. Condo. Ass'n, Inc. v. IDC, Inc.*, 844 A.2d 117 (RI 2004) ("*America I*") and *Am. Condo. Ass'n, Inc. v. IDC, Inc.*, 870

---

[1]  Not to be confused with IDC Clambakes, Inc.

BK No. 05-12267

A.2d 434 (RI 2005) ("*America II*").   Clambakes was not a party to
any of the Roos/Associations litigation.

This decision will not attempt to rehash the troubled history
between the Associations, IDC, Inc., Properties, and Roos, which is
set forth in detail in *America I and II*, 844 A.2d 117 and 870 A.2d
434, but will concentrate on the facts central to the Associations'
trespass claim against Clambakes.

IDC, Inc. and Properties are the successors in interest to
Globe Manufacturing Co., the declarant of a Newport, Rhode Island,
condominium complex situated on Goat Island, consisting of
approximately twenty-three acres.   The master declaration reserved
to the declarant the right to convert, *inter alia,* the Reserved
Area (also referred to as the North Unit) to a master unit and to
construct improvements thereon, until December 31, 1994.   For
reasons not known to the Court, nor relevant at this time,
Properties failed to timely exercise said development rights, but
instead attempted to extend the development rights deadline through
a series of amendments to the master declaration.

Between 1996 and 1998, meetings, discussions, and negotiations
took place between IDC, Inc., Properties, Roos, and the
Associations and their attorneys concerning, *inter alia,* the
validity of the amendments, fee assessments and voting schemes.   On
January 5, 1998, the Associations, Properties, IDC, Inc., and Roos,

3

entered into a Tolling Agreement which preserved the Associations' claims relative to the amendments, development rights, the Rhode Island Condominium Act, construction, repair and improvements, and the allocation of common element expenses.  This agreement was extended several times and remained in effect through May 31, 1999. Clambakes was not a party to the original Tolling Agreement, nor to any of its extensions.

Clambakes did not come into existence until April 18, 1996, as a new Rhode Island corporation, IDC Clambakes, Inc., for the purpose of "engag[ing] in the business of conducting social events, receptions, weddings, clambakes, cookouts, parties."[2]  It is agreed that Clambakes is a separate and distinct corporation with separate assets and liabilities, and that Roos is the sole shareholder and President of both Clambakes and Properties.

In late 1997 and throughout 1998, while the Tolling Agreement was in effect, Properties made plans and preparations to construct an opulent banquet facility on the Reserved Area.  Prior to the start of construction, in October 1997, the America Condominium Association raised concerns with the City of Newport Zoning Officer

---

[2]  State of Rhode Island and Providence Plantations Office of the Secretary of State, Division of Business Services Corporate Database, IDC Clambakes, Inc.   Summary Screen, Identification Number 89242, http://ucc.state.ri.us/CorpSearch/CorpSearchInput.asp (Search by entity Name "IDC Clambakes, Inc." then follow "IDC Clambakes, Inc."); see Fed. R. Evid. 201.

BK No. 05-12267

about the issue of parking on Goat Island to handle the proposed Clambakes operation. The Zoning Officer's response was "that the proposal is allowed under the zoning code of the City of Newport." *See* Debtor's Exhibit 21. Approximately four months later, upon the filing of the building permit for the construction of the facility, the America Condominium Association again raised the parking issue with the Newport Building Inspector. "It's our understanding that a permit application has been filed with your Office for the purpose of constructing a bldg. [*sic*] that would, among other uses, be used for clambakes. *While we don't have a particular objection as to the land use with respect to the building itself*, we do have a substantial problem with the parking requirements for that bldg., [*sic*] as well as for other commercial parking on and around that site." Debtor's Exhibit 63 (emphasis added).

On March 1, 1998, while the facility was still under construction, Properties entered into a twenty year lease with Clambakes, doing business as The Newport Regatta Club ("Regatta Club"), for the period May 1, 1998 through May 1, 2018, with a base annual rent of $180,000.00 plus six (6) percent of the lessee's gross annual revenue. In July 1998, an application was filed with the Board of License Commissioners to transfer the liquor license of Dorell, Inc. to IDC Clambakes, Inc., d/b/a/ The Newport Regatta Club. The issuance of the liquor license was delayed for several

5

BK No. 05-12267

months at the request of, and pending the America Condominium's Zoning Board appeal, but the liquor license was ultimately approved. There is no evidence that any of the individual unit owners or the plaintiff Associations opposed the liquor license transfer to Clambakes. *See* Debtor Exhibits 66, 67. The only question raised by the Associations during the construction of the facility concerned the adequacy and/or logistics of parking.

On December 16, 1998, the Regatta Club's use and occupancy certificate was issued,[3] and wedding reception and banquet operations began. Thereafter, from mid-December 1998 until April 8, 2005, Clambakes operated the Regatta Club and paid rent to Properties pursuant to the terms of their lease. During this seven year period the Associations made no protest nor took any action to enjoin Clambakes' operation of its business or to express objection – overtly or otherwise – to Clambakes' possession and/or operation of the Regatta Club.

_____

[3]   Nearly one year later, on October 20, 1999, America Condominium appealed the Newport building inspector's issuance of the building permit and certificate of occupancy on the grounds that it was in violation of a special use permit on the property, which appeal was subsequently denied. *Am. Condo. Ass'n., Inc. v. Benson*, No. 99-180, 2000 WL 33159156 (R.I. Super. Ct. May 19, 2000). The appeal did not raise any allegations of trespass against either Properties or Clambakes. Thereafter, America Condominium filed a lawsuit in Superior Court seeking a remand of the action to the zoning board, which request was likewise denied. *Am. Condo. Ass'n. v. Benson*, No. 99-180, 2001 WL 1452781 (R.I. Super. Ct. Nov. 2, 2001). Clambakes was not a party to any of that litigation.

BK No. 05-12267

Approximately six months after Clambakes began operating the Regatta Club, on May 28, 1999 – three days before the expiration of the Tolling Agreement, the Associations filed a state court action against IDC, Inc., Properties and Roos individually, alleging, *inter alia,* violations of the Rhode Island Condominium Act, R.I. Gen. Laws § 34-36.1-1.01, *et seq.* (1956), and that the voting scheme used in amending and extending the development rights in the Reserved Area was contrary to law and was therefore ineffective. Again, omitted from this lawsuit was Clambakes, despite its continuous occupation and well known operation of the Regatta Club at all relevant times, and Clambakes was never added as a party during the entire six year period that the *America* litigation wound its way through the Rhode Island Superior and Supreme Courts.

It should not be overlooked, that although the Associations were suing Clambakes' lessor, they never contested Clambakes' right to possess and operate, nor ever objected to its operation, as lessee, of the Regatta Club. To the contrary, during the entire time in question, unit owners contracted with Clambakes to host private events at the Regatta Club under standard business terms and rates, and the Harbor Houses Condominium Association similarly used the Regatta Club to conduct its annual meetings. At no time did any unit owners, or the Harbor Houses Association, or the Associations notify Clambakes that it was operating without the

7

BK No. 05-12267

consent of the owner, or assert any claims of trespass or unauthorized occupancy against it.   Instead, they used and enjoyed the Club for seven years.

On October 15, 1999, nearly one year after Clambakes took possession of and began operating the Regatta Club, the Associations recorded a Notice of Lis Pendens in the land records for the City of Newport against "IDC Properties, Inc., the present declarant and the record owner of the North Development Unit, the West Development Unit, and the South Development Unit," referencing the state court complaint seeking declaratory relief and money damages, *see* Plaintiff Exhibit E, again with no mention of Clambakes.

Soon after the Supreme Court's decision in *America II* in April 2005, holding that "title [to the Reserved Area and its structures] rested with the unit owners in common ownership from the creation of the condominium," 870 A.2d at 443, the Associations filed an Application for Writ of Execution for Possession and Writ of Ejectment, seeking for the first time to evict Properties, IDC, Inc., and Thomas Roos, *see* Debtor's Post Trial Memorandum, Composite Exhibit GG, but with still no mention of Clambakes in any of the papers.

On June 16, 2005, Clambakes filed the instant Chapter 11 case, initially trying to relitigate in this Court many of the same

8

BK No. 05-12267

issues already decided against IDC, Properties and Roos in the
state courts.   When that strategy failed, Clambakes began in
earnest to address its Debtor in Possession responsibilities, i.e.,
a plan was promptly confirmed, all other creditors and fees were
paid, and sufficient funds were placed in escrow to pay the
Associations in full, if their claims are allowed.   That fund
remains intact.

On July 11, 2005, a Chapter 11 trustee was appointed, and
shortly thereafter, in order to allow the Debtor to complete its
substantial summer event bookings scheduled from July 28, 2005
through October 31, 2005, filed an emergency motion requesting that
he be authorized to operate the Regatta Club in the ordinary course
and to make adequate protection payments to the Associations for
its use and occupancy during the Debtor's busy season.   Initially,
the Associations objected on the grounds, *inter alia,* that "the
unit owners' property is being used without their consent and
against the ruling of the Rhode Island Supreme Court," and also
alleging insufficient adequate protection payments and failure of
the trustee to agree to a peaceable turnover of the property upon
the conclusion of the requested use period.   *See* Doc. No. 66.   The
Associations further asserted that "[a]bsent privity or consent of
the owner, the Trustee is merely a trespasser, *and at this time*,
GIS [the Associations] requests the return of the Premises."   *Id.*

9

at 8 (emphasis added).  Negotiations followed, and on August 25, 2005, the Court approved a Consent Order settling the trustee's emergency motion, wherein the parties agreed that the trustee should continue to operate the Debtor's business in the ordinary course through November 5, 2005, in consideration of the payment of $450,000 as adequate protection for the use and occupancy of the premises for the period April 8, 2005 (the date of the Supreme Court decision declaring title in the unit owners), through November 5, 2005 (the date of the last permitted event booking).

<u>**LEGAL ISSUES and DISCUSSION**</u>

**I.    Under Rhode Island Law, did Clambakes trespass on Association Property?**

The resolution of property rights through an action in trespass is determined according to state law, *Taggart v. Weinacker's Inc.,* 397 U.S. 223, 227 (1970) (Burger, C.J., concurring).  The Rhode Island Supreme Court has defined a trespasser as "'[o]ne who intentionally and without consent or privilege enters another's property.'" *Bennett v. Napolitano,* 746 A.2d 138, 141 (R.I. 2000) (quoting *Ferreira v. Strack,* 652 A.2d 965, 969 (R.I. 1995)); *see, Min v. Pariseau,* No. 03-1033, 2008 R.I. Super. LEXIS 151, *17 (R.I. Super. Ct. Dec. 9, 2008); *Ludwig v. O'Connell,* Nos. 2004-0609, 2005-0578, 2006 R.I. Super. LEXIS 89, *23 (R.I. Super. Ct. July 19, 2006).

To recover for trespass in Rhode Island, a party "must show: '(1) the adverse party intentionally entered onto the owner's property; and (2) plaintiff had rightful possession of such property.'" *Goat Island S. Condo. Ass'n,* 382 B.R. at 179 (quoting *Smith v. Hart*, No. 99-109, 2005 WL 374350, *5 (R.I. Super. Mar. 1, 2005)); *see State v. Verrecchia,* 766 A.2d 377 (R.I. 2000); *Berberian v. Avery,* 99 R.I. 77, 81, 205 A.2d 579, 581 (1964).  In addition, one who has consent or privilege and enters another's property is not a trespasser. *Nye v. Brousseau,* No. 06-726, 2008 R.I. Super. LEXIS 123, *13-14 (R.I. Super. Ct. Sept. 23, 2008) (citing *Ferreira,* 652 A.2d at 969), *aff'd in part and vacated in part*, 992 A.2d 1002 (R.I. 2010).

An intentional entry is a voluntary act, as opposed to one that is unintended or accidental, and an alleged trespasser "'... is liable for an intentional entry although he has acted in good faith, under the mistaken belief, however reasonable, that he is committing no wrong... he is a trespasser although he believes the land is his own.'" *Smith*, No. 99-109, 2005 WL 374350, *5 (quoting William L. Prosser, *The Law of Torts,* at 74 (4th ed.)).  Here, it is undisputed that Clambakes entered the Reserved Area and took possession of the Regatta Club from 1998 until April 2005 under a lease with Properties.  Therefore, the first element of intentional entry has been established.

11

BK No. 05-12267

The Associations have also satisfied the second element of the trespass test, that they had rightful possession of the property. The Rhode Island Supreme Court determined the status of the Reserved Area in its *America II* opinion, specifically, that the disputed parcels "always were common elements, subject to the exercise of ... development rights, and title rested with the unit owners in common ownership from the creation of the condominium." *America II*, 870 A.2d at 443. Moreover, due to Properties' construction of the Regatta Club in the face of known claims, the Supreme Court further held that:

> In reviewing defendants' assertions that plaintiffs should not benefit from defendants' development of the Newport Regatta Club, we observe that defendants commenced such development with full knowledge of plaintiffs' claims and after they voluntarily entered into the tolling agreement. Considering that they developed the Reserved Area at a time when they were on notice that their right to do so was in dispute, we conclude that they constructed the parcel at their peril and cannot now contend that equity should prevent plaintiffs from prevailing because of their expenditures.
> However, with respect to the defendants' payments of common expenses on the disputed parcels after the declarant's development rights had expired, we concur that to permit the plaintiffs to enjoy the benefits of such expenditures would constitute an inequitable windfall.

*America I*, 844 A.2d at 135.

Based upon the Supreme Court's ruling that title to the Reserved Area rested with the unit owners in common ownership, both

BK No. 05-12267

the Associations and Properties as unit owners enjoyed a common right to possession, including legal title to the property, thus fulfilling the second element of trespass. *See St. Jean Place Condo. Ass'n v. DeLeo*, 745 A.2d 738, 741-42 (R.I. 2000), and R.I. Gen. Laws §§ 34-36.1-3.12, 34-36.1-2.07(e)(1956).[4]

**A. Consent or Privilege**

Having satisfied the first two elements of trespass – an intentional entry and a right to possession, we next address the issue of apparent consent or privileged occupancy. Specifically, "[c]onduct which would otherwise constitute a trespass is not a trespass if it is privileged. Such a privilege may be derived from the consent of the possessor ..., or may be given by law because of

---

[4] It was during this part of our original analysis in drafting this opinion that I felt a trespass had occurred as alleged by the Associations. In a post trial Chamber's conference, I announced my thinking on the trespass issue, and also informally advised the parties that it was my intention to certify the question of damages to the Rhode Island Supreme Court pursuant to Rule 6 of the Rhode Island Supreme Court Rules of Appellate Procedure. While considering the logistics of the Rule 6 certification procedure, I looked again at the issue of apparent consent or privilege, and have since concluded that based on the facts in this proceeding, a period of apparent consent and/or privilege did occur during a portion of the time Clambakes occupied the Reserved Area. As the damages issue will be discussed *infra*, the certification question (now abandoned) is no longer a consideration.

13

BK No. 05-12267

the purpose for which the actor acts or refrains from acting...."
Restatement (Second) of Torts, § 158, cmt. e (1965).[5]

In their post-trial memoranda and sur-reply briefs, both
parties addressed the existence, *vel non*, of consent for
"Clambakes" to operate the Regatta Club. *See* Doc. Nos. 670, 671,
672, and 673. Specifically, in their post-trial memorandum's
"Proposed Conclusions of Law," the Associations argued that
"[d]ebtor's possession of the Reserved Area was adverse and
'hostile' to the interests of the unit owners and not by their
express or implied consent." Doc. No. 670, at 11. Clambakes
argued that "[t]he Associations and other unit owners consented and
acquiesced to Clambakes' possession and use of the Reserved Area,"
Doc. No. 671, at 14, and that "IDC Properties, and Clambakes,
exercised acts of dominion over the North Unit and made ordinary
use of it consistent with their actual possession...." Doc. No.
673, at 3.

Clambakes occupied the Regatta Club pursuant to a lease
entered into in 1998 with Properties, at which time, Properties was

---

[5]  The Rhode Island Supreme Court has adopted the Restatement
of Torts in analyzing trespass claims, *see Mesolella v. City of
Providence*, 508 A.2d 661, 667 n.8 (R.I. 1986).

14

BK No. 05-12267

in possession of the Reserved Area and believed itself to be the owner.

"Consent is willingness in fact for conduct to occur.  It may be manifested by action or inaction and need not be communicated to the actor."  Restatement (Second) of Torts § 892 (1979).  "If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact." *Id.*

Apparent consent exists:

> "[e]ven when the person concerned does not in fact agree to the conduct of the other, his words or acts or even his inaction may manifest a consent that will justify the other in acting in reliance upon them.  This is true when the words or acts or silence and inaction, would be understood by a reasonable person as intended to indicate consent and they are in fact so understood by the other. This conduct is not merely evidence that consent in fact exists, to be weighed against denial.  It is a manifestation of apparent consent, which justifies the other in acting on the assumption that consent is given and is as effective to prevent liability in tort as if there were consent in fact.  On the other hand, if a reasonable person would not understand from the words or conduct that consent is given, the other is not justified in acting upon the assumption that consent is given even though he honestly so believes; and there is then no apparent consent."

*Id*. at § 892, cmt. c.

15

BK No. 05-12267

In the case at bar, the evidence shows consistently that throughout the seven year term of Clambakes' management and operation of the Regatta Club, the Associations manifested numerous actions (and inactions) signaling apparent consent to Clambakes' possession and operation of the Regatta Club.  From the outset, Clambakes was never included as a party to the January 5, 1998 Tolling Agreement, which was created to preserve the Associations' and Properties' rights to potential claims concerning the condominium property.  During the construction of the Regatta Club and even after it commenced operations, Clambakes still was not added as a party to the Tolling Agreement, despite numerous extensions (the last occurring on April 28, 1999).  Throughout 1998, while the facility was under construction and Clambakes was obtaining its required licenses and approvals, the Associations' only issue was their concern over parking.  "While we don't have a particular objection as to the land use with respect to the building itself, we do have a substantial problem with the parking requirements for that bldg., [*sic*] as well as for other commercial parking on and around that site."  Debtor's Exhibit 63.  Further, there were no objections raised to the City's transfer of the liquor license for Clambakes' use at the Regatta Club.

16

BK No. 05-12267

As previously noted, on May 28, 1999, approximately six months after Clambakes commenced full wedding and event operations, the Associations filed suit against IDC, Inc., Properties and Roos, alleging that the voting procedure used to extend development rights on certain common property violated the Master Declaration and the Rhode Island Condominium Act, R.I. Gen. Laws § 34-36.1-1.01, *et. seq.* (1956), and requesting declaratory judgment and injunctive relief as to the disputed parcels.  Clambakes was not a party in this litigation, and while Clambakes is charged with knowledge of its existence, given that its sole shareholder was a named defendant, the Associations gave no indication of their intent to withdraw their apparent consent for Clambakes to continue operating the Regatta Club pending the outcome of the suit against its lessor, Properties.  Quite to the contrary, one of the Associations, Harbor Houses, and various individual unit owners contracted directly with the Regatta Club to host private events on normal business terms.  This conduct demonstrates a continuing unequivocal expression of consent for Clambakes to conduct business at the Regatta Club, upon which Clambakes reasonably relied.  This apparently consensual relationship between Clambakes and the Associations continued for more than seven years, with no written or verbal notice, signage, or any other type of claim made against

17

BK No. 05-12267

Clambakes to quit the premises. Surprisingly, upon careful reexamination, it is clear that the Associations and the Roos entities have fought over and litigated every conceivable issue *except* Clambakes' occupancy and operation of the Regatta Club for the period in question, and as to that single issue, there was unmistakable apparent consent until the Supreme Court's second opinion, in *America II,* in April 2005.

In recent trespass cases where ownership between the parties was unknown and/or in question, the Rhode Island courts have found trespass to be actionable only when clear evidence of ownership was presented to the adverse party. For instance, in *Smith v. Hart,* No. 99-109, 2005 WL 374350, *5 (R.I. Super. Ct. Mar. 1, 2005), the court noted that the Smiths had the Harts' consent on almost all occasions, but that "[i]t was not until Mr. Smith presented the survey to Mr. Hart and asked him to adhere to the tree line when the trespass became both obvious, intentional, without license, consent or privilege. When the Smiths continued to mow some of the disputed parcel, the trespass became actionable." So too, in *Nye v. Brousseau,* No. 06-726, 2008 R.I. Super. LEXIS 123, *13, the court found that "[a]t no time did he assert ownership or direct Mr. Brousseau to go no further. Until they were surprised with the complaint, Mr. and Mrs. Brousseau knew of no adverse claim of

18

ownership.   All that had been done through that time was consensual." Thereafter, when "Mr. Brousseau knew he was passing onto property which was clearly owned by Mr. Nye," the trespass became actionable.   *Id*. at *14; *see also, Dellagrotta v. Dellagrotta*, 873 A.2d 101, 113 (R.I. 2005) (trespass damages arise from the point that plaintiffs demanded possession).

Accordingly, in the present case, and based upon the numerous expressions of consent (and consent by inaction, *i.e.*, failure to add, or to even reference Clambakes in any of the litigation involving ownership) over the course of seven years, I find as a fact and conclude as a matter of law that the Associations plainly and continuously manifested apparent consent for Clambakes to operate the Regatta Club on the Reserved Area from March 1, 1998 until April 8, 2005.

The instant dispute is between the Claimant Associations and the Debtor Clambakes, separate and distinct corporate entities, with no evidence of fraud in the record, nor alleged by any party, and there is no equitable reason visible to this Court, why the traditional principle of separation of corporate entities should not be observed between these parties.

However, after the April 8, 2005 Rhode Island Supreme Court *America II* opinion, ownership of the Reserved Area and the Regatta

BK No. 05-12267

Club was no longer in question.  870 A.2d at 442-43 ("[T]itle [to

the Reserved Area] rested with the unit owners in common ownership

from the creation of the condominium.").  Two months after *America*

*II*, the Associations filed an Application for Writ of Execution for

Possession and Writ of Ejectment to evict IDC, Inc., Properties,

and Roos from the Reserved Area, *see* Debtor's Post Trial Memorandum

Table of Composite Exhibits FF and GG, with the Associations still

not referencing Clambakes as a trespasser, or one who is occupying

without consent.  At that point, however, even without argument on

the issue, the conclusion is mandatory that, as of April 8, 2005,

the Associations' apparent consent ended, that, by operation of law

Clambakes became a trespasser upon the Reserved Area, and that said

trespass continued until Clambakes vacated the premises on November

5, 2005.

**II.   Are the Associations' claims for trespass damages**

**precluded by either America I or America II?**

The *America I* and *II* litigation addressed and determined,

*inter alia*, claims relating to the validity of condominium

declaration amendments, a representative voting scheme, the

ownership of disputed parcels, and control of the Goat Island South

Condominium Association, against three defendants – IDC, Inc.,

Properties and Roos.  As discussed *supra,* Clambakes was never a

20

BK No. 05-12267

party to any of this unrelated litigation, notwithstanding its obvious possession and operation of the Regatta Club. Since none of the aforementioned litigation was for trespass or damages resulting therefrom, this Court is not precluded from considering the Associations' claims for trespass and/or damages against Clambakes. *See Cronan v. Iwon*, 972 A.2d 172, 174-75 (R.I. 2009)(mem.).

**III.   Since a trespass has been found against Clambakes, what are the appropriate damages for this tort?**

The Associations contend that they are entitled to be paid for the use and occupancy of the Regatta Club from 1998 to 2005, for an amount within the range of $2.6 to $3.2 million dollars, based upon the testimony of its appraiser (Proofs of Claim 16-19). I disagree.

Where, as here, the trespasser encroached upon the owner's property by building something on it, "injunctive relief normally is available against the unlawful placement of a structure on property." *Renaissance Dev. Corp. v. Universal Properties Group, Inc.*, 821 A.2d 233, 237 (RI 2003). And, in cases where structures are wrongfully placed on property, the customary relief is for the issuance of a mandatory injunction for the removal of the structure and/or a request for equitable relief by the party erecting the

BK No. 05-12267

structure.[6]  *See Santilli v. Morelli*, 102 R.I. 333, 338, 230 A.2d
860, 863 (1967); *see also Renaissance Dev. Corp.*, 821 A.2d at 238;
*Raposa v. Guay,* 84 R.I. 436, 444, 125 A.2d 113, 117 (1956).  Here,
in the exercise of unquestionably astute business judgment, the
Associations do not request such injunctive relief, but wisely are
putting their newly acquired property to its obvious highest and
best use – as a cash cow with a virtually unlimited life
expectancy.

The Associations and the Chapter 11 trustee quickly reached an
arm's length, and Court approved, agreement resolving the trustee's
emergency motion for an order authorizing the trustee to conduct
business in the ordinary course and to make adequate protection
payments establishing the amount due for Clambakes' use and
occupancy of the Regatta Club for the period April 8, 2005 to
November 5, 2005.  *See* Doc. No. 93.  In assessing the value of the
Associations' claim, I find that the appropriate measure of damages
is the amount the Associations consensually accepted for use and
occupancy from the trustee for the period of the Clambakes'
trespass.  Considering the facts and the nature of the trespass in

---

[6]    In such circumstances, the courts look to whether
restitution should be awarded based upon a mistaken claim of title.
*See Eastern Motor Inns, Inc. v. Ricci,* 565 A.2d 1265 (R.I. 1989);
*Raposa v. Guay,* 84 R.I. 436, 125 A.2d 113 (1956).

22

BK No. 05-12267

question, I also find that fair and adequate damages and compensation have already been paid to the Associations for Clambakes' use of the property, *i.e.*, in light of the Rhode Island case law and supporting legal authorities, the damages to which the Associations are entitled is the $450,000 already paid by the Chapter 11 trustee to the Associations for occupying the Regatta Club from April 8, 2005 to November 5, 2005.

### IV.   The Claim for Plumbing Expenses

With respect to the Associations' claim in the amount of $7,250 for plumbing expenses required to fix a clogged common sewer, the evidence is clear that the Debtor caused the drainage malfunction, and is responsible for the reasonable cost to remedy that problem. See Kinder testimony, Trial Tr., at 36, 37, Aug. 5, 2008:

> ... Obviously, the – you know, the only establishments using those things that were going into that sewer line were those that were being operated by IDC. We asked IDC and were assured that they would pay the costs, repeatedly. They never paid anything, and so we are asking that that get covered.
>
> ...

23

BK No. 05-12267

Q. What is Exhibit "Z?"

A. Exhibit "Z" is the bill that was received by D[o]novan[] and Sons, in which the condominium association paid.

Q. This relates to this plumbing issue?

A. It does.

Q. And what was the total amount of the bill caused by the blockage?

A. $7,290. And we paid it promptly.

Q. And the bill reflects exactly what the plumbers discovered, as the blockage? Correct?

Mr. Devereaux: I'm not going to cross-examine the plumber, Judge.

The Debtor has offered no evidence or argument in opposition to this claim, and it is **ALLOWED** as filed.

### CONCLUSION

Based upon the record before this Court, and in accordance with the foregoing discussion, arguments, and authorities referenced herein, (1) the Associations' request for a finding of trespass against Clambakes is **GRANTED IN PART**, *i.e.*, for the period April 8, 2005 to November 5, 2005; (2) the Associations' claim for damages is not precluded by *America I* or *II*, but is limited to the

24

BK No. 05-12267

amount already received by the Associations in the form of adequate

protection payments from the Chapter 11 trustee for Clambakes' use

and occupancy of the property during the trespass period; and (3)

the Associations' claim for reimbursement for plumbing expenses is

**ALLOWED** as filed.   The Associations' claim for as much as $3.5

million for a seven year trespass period, is **DISALLOWED** for the

reasons discussed and stated herein.

Enter judgment consistent with this opinion.

Dated at Providence, Rhode Island, this      9th       day of

June, 2010.

_____
Arthur N. Votolato
U.S. Bankruptcy Judge

Entered on docket: 6/9/2010

25